UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:18CR79-PPS |
| | ) | |
| QINGYOU HAN, | ) | |
| | ) | |
| Defendant. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:19CR134-PPS |
| | ) | |
| HANS TECH, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

Qingyou Han and Hans Tech, LLC have entered pleas of guilty to a charge of wire fraud involving a scheme to fraudulently obtain more than $1.6 million worth of grants from the National Science Foundation and matching grants from the Indiana Economic Development Corporation.[1]  In a fraud case, a major driver of the calculation of a sentencing range under the U.S. Sentencing Guidelines is the amount of loss.  In trying to calculate the loss amount, the parties have presented me with a binary choice.  On the one hand, the government contends that the loss amount is the entire sum of the grants made to Hans Tech, totaling over $1.6 million.  On the other hand, the

---

[1] An element of Hans Tech's plea deal is the government's agreement to dismiss the charges against Han's wife and co-defendant Lu Shao, the President of Hans Tech.

defendants argue that the amount of loss is zero because I have to take into account the fair market value of the services performed by Hans Tech on the grants, which totaled almost $2.5 million. Because the amount of the loss is a critical issue in the computation of the Guidelines, I will resolve that dispute in this opinion; all other objections will be ruled on at the sentencing hearing.

In summary, the indictment alleges that NSF has two grant programs that are known as the Small Business Innovation Research and the Small Business Technology Transfer programs. The purpose of these programs is to increase opportunity for small businesses to participate in government funded research and development and to help encourage innovation in the small business community. *See* Superseding Indictment at ¶5-6. As the name implies, these are grant programs; nothing is expected in return other than honesty in the application process. Han and Hans Tech made a number of material false statements in their application for the grant money, and they were awarded the grants plus matching grants from the State of Indiana. Had the NSF known of these false statements, the grants would not have been awarded to Han and Hans Tech and instead would have gone to a more worthy business, presumably one that would have told the truth in the application process.

In their plea agreements, Han and Hans Tech each admitted a substantial number and breadth of allegations made in support of the wire fraud charge. [*Han*, DE 88-1 at ¶8; *Hans Tech*, DE 2 at ¶8.] Among the allegations Han and Hans Tech have admitted is the government's claim that they "devised and intended to devise a scheme

2

to defraud the NSF by obtaining funds totaling over $1.3 million by means of materially false and fraudulent pretenses, representations, promises and material omissions." [*Han*, DE 29 at ¶15; *Hans Tech*, DE 1 at ¶15.]  Han and Hans Tech have also admitted that the "purpose of the scheme to defraud was to obtain NSF . . . grant funds allocated for research and to use some or all of those funds for other purposes, including to pay personal expenses or for the enrichment of HAN or SHAO or their children."  [*Han*, DE 29 at ¶16; *Hans Tech*, DE 1 at ¶16.] Having stipulated to these facts in their plea agreements, Han and Hans Tech's sentencing objections disputing the same facts now are unavailing and serve to call into question their credibility. [*See, e.g., Han*, DE 108 at 1; *Hans Tech*, DE 14 at 1.]  I will decide at sentencing whether for this reason and others I should deny Han and Hans Tech a reduction in their offense levels for acceptance of responsibility. *See* U.S.S.G. § 3E1.1.

In pleading guilty, Han and Hans Tech agreed that in awarding over $1.3 million in research grants between 2007 and 2014, NSF decisionmakers relied on representations made in the grant proposals Han wrote on behalf of Hans Tech.  [*Han*, DE 29 at ¶17; *Hans Tech*, DE 1 at ¶17.]  When deciding to pay out grant funds previously approved, NSF decisionmakers relied on representations made in various reports and documentation submitted on behalf of Hans Tech.  [*Id.*] One fraudulent representation made in a Hans Tech grant proposal was a false claim that a third-party investor would provide $100,000 to support Hans Tech research, when the supposed third-party was

3

instead Han's own creation and was not otherwise truthfully described in the grant proposal. [*Han*, DE 29 at ¶18; *Hans Tech*, DE 1 at ¶18.]

There were other problems with the application process. For example, funds from Hans Tech's bank account were used to purchase a residence in Lu Shao's name, after which Hans Tech paid Shao monthly rent of $3,000 to use the property, totaling more than $150,000 of NSF grant funds being paid to Han's wife in rental income during the scheme. [*Han*, DE 29 at ¶19; *Hans Tech*, DE 1 at ¶19.] In the plea agreement and at the plea hearing, Han also agreed that the scheme to defraud included the submission of documentation to obtain grant funds to pay $24,000 each to a "Technical Assistant" and a "Secretary" who were, in fact, Han and Shao's two minor children who were 14 and 9 when the payments commenced. [*Han*, DE 29 at ¶21; *Hans Tech*, DE 1 at ¶21.] More: the $75,000 wire transfer that is the particular subject of the wire fraud charge was prompted by the submission of a report overstating the earnings of the Technical Assistant in order to "conceal excess compensation that had actually been paid to HAN or SHAO." [*Han*, DE 29 at ¶25; *Hans Tech*, DE 1 at ¶25.]

In addition to these facts admitted by the defendants, the government has supported its position on the loss amount with the Victim Impact Statement of Dr. Prakash G. Balan, Program Director, National Science Foundation. Dr. Balan's statement makes clear that the fraudulent behavior of Han and Shao resulted in their gain of highly competitive research funds at the expense of other grant applicants. In other words, there is a finite amount of money available and the competition for the

4

funds is fierce. It's a zero sum game; because Hans Tech received the funds, someone else necessarily did not. As Dr. Balan put it: "Qingyou Han and Lu Shao through their premeditated plans to defraud the NSF have also prevented other qualified small businesses looking to compete for an award to pursue their promising and technological innovations to address pressing societal challenges, from getting the funding they could have received." [*Han*, DE 114-1 at 2; *Hans Tech*, DE 18-1 at 2.] Dr. Balan calls Lu Shao's conduct a betrayal of "the public trust placed in her and her small business," and characterizes her as "a fraudulent user of federal funds" who "has served to deprive other lawful businesses of funds that are allocated competitively through the NSF's Small Business Innovation Research based on the NSF trusting the representations made regarding the use of the grant funds provided." [*Id.*]

As alluded to above, the principal dispute between the parties relates to how to compute the loss amount under the Sentencing Guidelines. The computation of the offense level for a fraud case is governed by §2B1.1. The Sentencing Commission's "Background" for §2B1.1 notes that "ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes," so that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline." The more you steal, the higher the offense level. As a result, the amount of loss increases the offense level on a sliding scale set forth in

5

§2B1.1(b)(1), and a loss of between $1.5 million and $3.5 million adds 16 points to the offense level.

Application Note 3 provides guidance for determining the amount of loss. General principles include that "loss is the greater of actual loss or intended loss," and actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense." App'n Note 3(A) and (A)(i). The sentencing court is not an auditing firm expected to conduct an exhaustive inquiry and precise calculation of the amount of loss. *United States v. Williams*, 892 F.3d 242, 250 (7th Cir. 2018). Instead, the court "need only make a reasonable estimate of the loss" based on its assessment of the evidence and any relevant factors including "the scope and duration of the offense." App'n Note 3(C) and (C)(vi).

Each party invokes an Application Note favorable to its position. Han and Hans Tech cite Note 3(E)(i), providing that the loss "shall be reduced by...[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." For its part, the government invokes Note 3(F)(ii): "In a case involving government benefits (*e.g., grants,* loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." (Emphasis added).

Han and Hans Tech approach the question of loss from the perspective of quid pro quo, and have gone to considerable lengths in an attempt to quantify the value of

6

the research performed by Hans Tech. But in my view, this misses the mark. The National Science Foundation's grants are not made for the purpose of obtaining particular scientific research. Indeed, the government doesn't receive *anything* in return for the provision of these grants. It's not like the applicants are building a road for the government or something tangible like that. In fact, federal law provides that the agency awarding such grants is not permitted to receive property or services for its benefit in exchange for the grants. By definition, a "grant agreement" governing a federal agency's transfer of financial assistance to a non-federal entity is intended to "carry out a public purpose authorized by a law of the United States" and "not to acquire property or services for the Federal awarding agency." 2 C.F.R. §200.51 (2020). *See also* 31 U.S.C. §6304 (purpose of a grant agreement is not "acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government").

Of course, the NSF seeks to fund "the most important and transformational research that could address pressing societal problems of today." [*Han*, DE 114-1 at 1; *Hans Tech*, DE 18-1 at 1.] But rather than seek value to be conferred upon the NSF, its grant programs expect that grant recipients "will seek to use tax-payer funds with the deepest commitment and responsibility in the pursuit of new knowledge for the longer-term benefit to the tax-payer and society." [*Id.*] Where NSF grant funds are obtained by fraudulent means and used for unintended purposes, the entirety of the funds granted are ill-gotten, and have been unavailable for NSF's intended purpose of funding

7

innovation that might have been undertaken in an ethical and honest manner by another small business.

Given that Han and Hans Tech's fraudulent scheme deprived other worthy applicants of over $1.6 million in grant funding, in view of the scope of the scheme in time, in dollars, and in the number of separate false and fraudulent representations involved, I am thoroughly persuaded that the full amount of the government grants they received constitute "benefits obtained by unintended recipients or diverted to unintended uses," within the meaning of Application Note 3(F)(ii) to §2B1.1. What's more, it is hard to ignore the fact that this application note specifically lists "grants" as an example of government benefits programs governed by this provision of the Guidelines. As a result, in a case like this one where the government benefit is a "grant," the amount of loss cannot be less than the full value of the benefits obtained. [*Id*.]

I also believe that the "Government Benefits" application note clearly trumps the "Credits Against Loss" application note in this instance. The grants were not made for the purpose of obtaining the fair market value of either services or research results – recall that the government received nothing in return for the grants. As a result, the defendants' invocation of Application Note 3(E)(i) attempts to put a proverbial square peg in a round hole.

It is true that the Eleventh Circuit has held to the contrary. *See United States v. Near*, 708 Fed.Appx. 590 (11th Cir. 2017). As in this case, the convictions in *Near*

"stemmed from misuse of grant money" the defendants received from the NSF and the National Aeronautics and Space Administration. *Id*. at 593. Considering the same two application notes as are invoked here, the Eleventh Circuit was persuaded that the value of the defendants' services could be credited against the government's loss, resulting in a net loss of zero for purposes of §2B1.1. *Id*. at 603-04. Setting aside the fact that *Near* is unpublished and not binding on me in any event, I also happen to think it is wrongly decided. I cannot square the Eleventh Circuit's approach with the plain reading of the application notes as described above. In my view, respectfully, the Eleventh Circuit's reliance on the concept of "the value of services provided" is misplaced, because as I explained above, the granting agency is not the recipient of any such value. *Id*. at 603. Simply put, the value given by the granting agency in the form of the grant cannot be offset by value "received" when the agency didn't actually get anything in return.

That reasoning distinguishes another case relied on by Han and Hans Tech. In *United States v. Nagle*, 803 F.3d 167 (3rd Cir. 2015), the loss amount attributable to fraud against federal transportation funds was subject to offset because the money was given in exchange for highway construction services, and to the extent those services were performed, value passed in both directions, reducing the victim's total loss. *Id*. at 180. As the government points out, the distinction is reflected in federal law between "grant agreements" with no quid pro quo (*see* 31 U.S.C. §6304(1)) and "procurement contracts" whose principal purpose is to acquire "property or services for the direct benefit or use

9

of the United States Government" (*see* §6303(1)).  To repeat, on my understanding of the facts before me, no value from Han and Hans Tech's research passed in the direction of the NSF, and no offset is due as against the full amount of the grants bestowed on recipients who fraudulently received and utilized the money.

It is undisputed that the total amount Hans Tech received in grant funding was at least $1,351,996 awarded by the NSF and an additional $300,000 in matching grants awarded by the Indiana Economic Development Corporation, for a total of over $1.6 million.  [*Han*, DE 110 at 2, 20; DE 114 at 14; *Hans Tech*, DE 16 at 1, n.1 ]  I conclude that the loss amount for purposes of §2B1.1(b)(1) is more than $1,500,000 and less than $3,500,000, requiring the addition of 16 points to the offense level.  I therefore overrule the objections of Han and Hans Tech to the portions of their PSRs pertinent to this issue.

**ACCORDINGLY**, for the reasons set forth above, the specific offense characteristic for the amount of loss to be applied in the U.S. Sentencing Guidelines offense level computation as to defendants Han and Hans Tech will result in a 16-point increase under §2B1.1(b)(i)(I).

SO ORDERED.

ENTERED:  August 17, 2020.

    /s/ Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT